Good morning, your honors. Good morning. May it please the court, I believe I have asked for five minutes in rebuttal and I want to just make sure that I mentioned that to the court prior. That's fine and that will show up as a yellow light for you. That's what I was told. Thank you, your honor. We're here today, Mr. Woods is here today bringing five issues that he believes have merit with regard to either a outright dismissal or a reversal of this case for a new trial. All of these issues, I have four of these issues outlined in an order to lead up to the final issue, which is the district court erred when it denied Woods' motion to disqualify. I think all of these issues that I talk about, these four issues in the beginning, all have some relevance to the recusal request that we asked earlier and made that request continuing throughout the proceedings. I would like to start with regarding the district court error when it denied Woods' motion to dismiss for the intentional destruction of evidence by the government's lead agent, FBI agent, Cesario. Cesario was the lead agent in the case from the very beginning and when I say that he was the lead agent in the case, he was the lead agent not only with the FBI, but also with IRS, but he was working in combination with the U.S. Attorney's Office. This was not a typical case that was handled by the FBI or handled by a law enforcement agency and then ultimately handed over to the U.S. Prosecuting Attorney's Office. The U.S. Prosecuting Attorney's Office was involved in the investigation with Cesario from the very beginning. He conducted all of the interviews. He prepared all of the 302s that were in the case. He issued all of the subpoenas. There was another agent, Agent Munns, who was later replaced, and we'll talk about that in a minute, who basically just followed around Agent Cesario. He had not much more involvement in that. No 302s were prepared, no contact with Mr. Neal, Mike Neal, who ends up being a confidential source in this case, and the lead witness for the government. Without Mike and Neal, without Mike and Neal's testimony, the government had absolutely no case. So everything depended on what Mike and Neal was going to testify to. What about the documentary evidence? Are you saying that without Mike and Neal's explanations regarding what those documents meant and what the intention behind them was that there was no case? Absolutely. What would the case have looked like without Mike and Neal? What would the documents have shown? Great question, Judge Kelley. The documents would have shown that Mr. Woods prepared legislation that went through the legislature that was signed off by all legislators. It had vetting along the way with regard to what was happening. Basically, what you would have is you would have a senator doing his job from beginning A to Z to make sure that a constituent or someone who was looking for some money out of these gift funds that were available. And there was checks and balances along the way in order to get that money back. So going back to your question, what you have is you have my client saying the money that he received from Mr. Shelton was a loan. That was our theory of the case. So all of the documentary evidence that was put into the case, all of it didn't hurt Mr. Woods until you added the testimony of Mike and Neal saying that there was a conspiracy. So then you have to link up what Cesario did to Neal. And so how, as a practical matter, does that help the defense of trial? I mean, I know as a general matter, I understand you've got an agent who has done something, has destroyed evidence. That in and of itself is significant. But how does that impact the credibility of Mike and Neal or whether the jury would believe what Mike and Neal is saying for some reason? Again, great questions. They are answered in the brief, but I want to mention them because it's worth noting. You have a lying FBI agent who lied to his superiors, lied to his bosses, lied to the U.S. Attorney's Office, supposedly, lied to the judge in the case, in this particular case. And you have this agent working specifically with Mike and Neal and Mike and Neal's attorney. The case, the record is clear that Mike and Neal's attorney was in constant contact with Cesario through text messaging regarding the recordings, regarding what was going on in the case. So now Mike and Neal is the linchpin. He's the key to put all this together. Now you have a bad agent who's basically recording my client while he's represented by counsel. These tape recordings were supposedly being given to his attorney and then in turn these tape recordings were being turned over to Cesario. All without the knowledge of the U.S. Attorney's Office who was working hand-in-hand with this agent throughout. When they went to meetings together, the U.S. Attorney's Office was there. That's how close this man was to the investigation. So when you go back to the documentary evidence, well, yeah, sure. The government statement of the case, if you look at it, it outlines all the things that Mr. Woods was convicted of. But all of those convictions were based solely on the testimony of Mike and Neal. Because all the other documentary evidence just showed what it is that we were trying to show. Okay, he had a friend, he got that job a friend, long life friend, and then when that friend received some money he asked for a loan. There was no secret about the fact that there was some money transferred between Mr. Neal and Mr. Woods. The question only became was, was it a loan or not? That was the only question in the case. So if one of the remedies you've sought is a motion to dismiss, let's just put that one aside for purposes of this question. Yes. What is the appropriate remedy? Well, outside of the motion of dismissal? Right, putting aside, understanding that that's your first choice, but as a trial matter. As a trial matter, let me just say this, it's hard for me as a trial attorney to ignore the law. I think young blood applies, and I think young blood requires a dismissal. But if you're asking me to come up with something outside of that, obviously one of the first things is presenting this evidence at trial. Giving the defense the opportunity to show what was happening with these, what was going on with the relationship with Mr. Neal and also with the FBI agent. Talk about the fact that the FBI agent lied to his superiors, lied to the U.S. attorneys all, and then put on this evidence and then let the jury make a determination. Because remember, you have to believe Mike and Neal. Well, Mike and Neal is associated with Robert Cesario throughout this whole entire thing, and Robert Cesario is willing to go in there and lie and disregard his oath in every single regard. He's the person who's in constant contact with this confidential source through his attorney. So that, in and of itself, gives huge ammunition. And we had evidence that Mr. Neal was being somewhat coerced during his interrogation, and there were some questions that were asked that put his credibility in question. Threats, or the idea of threats, or the potential of consequences. I see this every day as a defense attorney. The district court did give you the opportunity, didn't it, to raise this possibility of introducing this evidence if, at trial, Mike and Neal testified in such a way that indicated that whatever may or may not have been on the laptop was relevant. Was there nothing, there must have been nothing that changed in Neal's testimony at trial? At trial, if you look at the trial testimony, he was so limited as to what it is that he could testify to that the tapes never became an issue. The tape recordings never became an issue. The only way that we could get in the tape recordings is to go through a whole outline of evidentiary issues that we didn't feel that we were going to be able to accomplish in getting in some of these tape recordings. And some of those concerns are outlined in our reply brief. Don't think we were trying to get in the exculpatory tape recordings, but it was the avenue that we did not have available to us in order to get there. We had to be limited to the direct. The government knew that. Their first witness was Mike and Neal. They knew what they were doing by putting Mike and Neal on the first day of a 19-day trial. Did you ask Judge Brooks to allow the tapes to come in? No, Judge Brooks was very candid. He said, well, you know, there may be a way that you can get some information in here, and you may be able to work your way into those tapes and be able to get those in. But in light of the rulings that Judge Brooks was making up until that point, the limitations that he put on what it is that we can do with Robert Cesario, and those orders were quite clear. And then tie that into the list of the rules of evidence as far as how you get that information in. We didn't feel in good conscience, in good faith, that we could make those arguments in order to get that information in. And it was considered. Going back to the very first question that Judge Kelly asked, I'm not sure I understand your answer. The question, as I understand it, is what is it about Cesario being a – okay, we start with the proposition, Cesario's a liar. Yes. And he's intimately involved with Mike and Neal. Yes. Okay. So is there anything beyond the fact that Mike and Neal is associating with a liar that calls into question his credibility beyond the fact of the association with Cesario? Well, I think – I was trying to pinpoint with Judge Kelly the connection that I think that directly went to Mr. Neal. Well, I mean, we agree that they were close. We agree that they were intimately involved in this investigation together, and everybody agrees, including the government, that Cesario's a liar. Right. So how – but why does that – but still, I'm a little troubled. What's the connection? Well, I mean, the connection is what? You have bad faith. You have information that was on a computer that we requested over and over again, information that was inconsistent. We were getting discovery and noticing there was references to tape recordings that we didn't have. I mean, these weren't just – we weren't on a fishing expedition. We were lining out in these motions why it is that we think that there's more out there. And then, now you have Cesario who says, hey, look, that laptop, the only case I worked on on that laptop had to do with John Woods. He says that. The government said that, the only thing that had to do with it. So when we start asking for these recordings and asking for information about John Woods on this laptop, that's the only thing that was required of Cesario, to go down there and get the laptop, take anything off of there that's relevant of John Woods, and then return it. He didn't do that. He knew what we were asking for. He knew exactly what we wanted. He knew that it was limited. We weren't asking for an overall mirror image of his hard drive. We were asking for specific information that related to this case, and he destroyed it. And then he destroyed it, again, to ensure that the FBI wasn't able to figure out where it is that he wiped it the first time. So all of these things leading up to the destruction of this laptop is a part of it. I mean, every connection that Cesario had with Mike O'Neill and Wayne Wilkinson was on that computer. It was subject to testing. We would have been able to figure out the metadata. We would have been able to figure out whether there was some communications or some audio recordings that went to this officer, not through the Dropbox, but by other ways because the record's very clear that there was more recordings that we ended up getting our hands on. Where'd they go? So that's the reason why, going back to what it is I said, is this yellow light telling me I'm going into my end time? Yes, it is. It is. So I have three minutes, but I want to close this up with regard to District Court Erwin and the motion for continuance. This is a huge issue again. We had three people who were getting ready for trial together as a team involving millions of documents, involving hundreds of witnesses, involving thousands of exhibits. We had this thing pared out how it is that we were going to do. Our theory of the case was this never happened. It was a loan to John Woods. No one ever knew anything about anything else, and that was our theory of the case. There was nothing inconsistent about that, and then on five days prior to that, who, by the way, does not testify. He ends up not testifying but ends up into an agreement to where he is indicated as being a witness in this case. We asked for a brief continuance. It was denied. The case law makes it clear. It may not be in this district because I don't think we've ever had an instance of that, but the Seventh Circuit case says it should have been granted a brief continuance in order to deal with those types of issues. They were larger than the ones that were offered up in the cases that were provided, and we had more to deal with in our case, and I think the record speaks of that. And then with regard to Woods' motion to disqualify, just like I can tell a jury, they don't have to ignore their common sense coming into a jury box in order to make decisions. Read the orders. Read the hearings. Listen to the hearings. Listen to how we were treated. Listen to how we were treating our motions. We were filing good, solid, meritorious motions using the standards that this court has set out and the U.S. Supreme Court has set out, and we are getting somewhat close to reprimanding and wasting the court's time every single time that we brought those issues in. And it was a theme throughout. It was a theme through the very beginning that we were not being treated fairly. It doesn't take me arguing what it is that he said or why he said it or what it is. You can feel it. Your law clerks who read the file are going to be able to feel it. There was something different about how it is that we were being treated in that courtroom, and I think he should have disqualified himself for a number of reasons that were outlined in the original petition, but more so for how he treated us in these orders after we were bringing meritorious claims. So I am out of time. I'm hoping that I do get a little more rebuttal from my colleague who is now going to step up, but I appreciate the court's time. Thank you. Thank you. Ms. Kohler? May it please the court. Excuse me. My name is Shelley Kohler, and I represent separate defendant Randall Shelton. I kind of feel like the Cesario issue is like a dead horse, and it's been beaten, beaten, beaten. But I do want to take a second and kind of distinguish Mr. Shelton from Mr. Woods with regard to Agent Cesario's laptop. One of the court's major concerns is what could have been on this laptop, you know, that could have been potentially exculpatory or helped Mr. Shelton. Well, Mr. Shelton was in a completely different position than what Mr. Woods was in. The only evidence having to do with anything relating to some sort of bribe or kickback pertaining to Mr. Shelton came from the testimony of Micah Neal. You can have all the bank records in. Mr. Shelton has never denied giving money to John Woods. The question was, was it a loan or was it a bribe? And Micah Neal is the only one that said, I met Mr. Shelton behind Neal's Cafe, and he paid me X thousands of dollars, and it was a bribe for legislation. He did this on behalf of John Woods. That's the only evidence related to Mr. Shelton. Mr. Woods is not my client. The other thing that I would like to point out is, I believe it was Justice Kelly was asking about the credibility of Micah Neal based on his contact with Special Agent Cesario. The answer to that question goes back to what I just said. There were recordings that we know of that were between Micah Neal and John Woods where Micah Neal was denying that any bribes or anything like that took place. If there were recordings like that pertaining to my client, that is absolutely exculpatory evidence. Did Micah Neal testify, correct? Yes. He was asked, were there any recordings with Mr. Shelton? No, he was never asked that question, Your Honor. As to what could potentially be on this laptop is what I'm getting at. So I guess why do we think that there are some recordings with Mr. Shelton? Because Micah Neal testified that he went around and he recorded everybody. He recorded things as mundane as being the checkout cashier at Neal's Cafe to recording meetings in the state capitol. Mr. Shelton met with Micah Neal on several occasions. They had lunch together at Neal's Cafe. So there's no reason to think that he would not be recording Mr. Shelton's conversations as well. He testified that he was recording everybody. But those all came through Mr. Neal's lawyer's office, right? So those came through the Dropbox, correct? So your theory would have to be that Agent Cesario got recordings directly from Mr. Neal that did not go through his lawyer's office? No, Your Honor, not at all. That is not our theory. Here's the thing about the Dropbox. Excuse me. We know the testimony was that Carrie Layton's computer crashed. She was the secretary, the paralegal for Mr. Neal's attorney. And in trying to get to the bottom of who had what and when, the court ordered that the defense and the government get together and try to figure this out. So one of the things that we did was we went back to Ms. Layton to find out about her computer. Well, we found out that her computer had crashed, but thankfully the store where they restored it still had a copy of the active files that were on her computer. The problem is it did not have a copy of, it was not a full forensic image. And that came from Amy Corrigan, who was the government's expert witness. And she said that it did not have the unallocated space. And so if something had been deleted, and I'm not even saying that it was done nefariously, but if something had been deleted, it would not have shown up in the copy that we had at that point in time. Because we did not have a full forensic image. Now, we do have Dropbox records, but the problem with that is that the Dropbox expert testified that, well, you can't really rely on these records. Yeah, it says added, but that could mean edited. That could mean deleted. That their records were not meant to be used in a court of law. Okay, Mike and Neal was not permitted to testify about the recordings at trial, correct? That is right. But in the pretrial hearings, did he not testify? Yes, he did. And no one asked him whether there were any other recordings? He said he doesn't remember who it was that he recorded. He said he has no idea how many recordings he made. The other thing that I think is important to point out about there being potentially more recordings out there is there were two PIN recorders that were used. And the first one broke. So Mr. Wilkinson ordered Mr. Neal a second one. Well, the forensic examination of Ms. Layton's computer showed that, in fact, both PIN recorders had been, at some point in time, plugged into her computer. Now, Amy Corrigan could not say what happened with that. All she could tell us was that, yes, both PIN recorders had been plugged into her computer. Mike and Neal testified that he used that PIN recorder to make recordings of people. We don't have any recordings from that second PIN recorder. So we're obviously missing recordings. The other thing that we know, the night of the pretrial hearing, when it was decided that Agent Cesario was going to have to turn over his laptop, this was on November the 30th, he told the government that night that his laptop had been wiped because of ransomware or something along those lines. But then we do have records from Dropbox that show that he went and he accessed his Dropbox account on December the 1st at 6.22 a.m. So the very next morning, he's accessing Dropbox. Now, Dropbox can't tell us what he's doing with it, but he's accessing it. Then the records show that he accessed it again at 2.23 that afternoon of December the 1st, and this was at the FBI office. So we know that he's accessed this Dropbox account at least twice since he was told, we want to have an examination of your computer. Can I get some water, please? Thank you. The reason that is important is because Amy Corrigan testified that if Dropbox files were in the shared folder and there were shared users, which there was evidence that Cesario and Kerry Layton were shared users, if one user deletes something, it also gets deleted off of the other person's. So it's deleted in both files. The problem we have now is we don't have Ms. Layton's full computer. It crashed. So any files that Cesario potentially deleted would have been in her unallocated space. When you say crashed, what do you mean? Well, it turns out, I think it was just a connection issue, but her laptop would not start. And so they took it to a computer repair place, and instead of repairing it, basically they got a new one. And in the process, the computer store was able to do an image of everything that had been on the crashed laptop, all the active files. It did not get what was in the unallocated space. And that's the issue that we're having here. We will never get back to patient zero. Unfortunately, it's impossible. The two PIN recorders are nowhere to be found. Nobody knows what happened to them. Ms. Layton's laptop crashed, and Cesario wiped his computer. There's no way to get back to patient zero. We think dismissal is the only appropriate remedy here. There is no other appropriate remedy because the cases that were cited by the government and by the judge generally had to do with Fourth Amendment violations, where something was seized illegally under the Fourth Amendment. Well, of course, you can suppress that. But we have a destruction here. And your theory is that there must be, or there is likely to be recordings between your client and Mike O'Neill. Well, I think this is an important fact. The district court specifically found that there was potentially exculpatory evidence on Special Agent Cesario's laptop. He found that, and he found that there was bad faith. And so, therefore, that there was a due process violation. All of those were findings of fact. And so, really, it's under young blood. What is the remedy? The courts already found that there was potentially useful evidence for the defense on that laptop. You're asking for a per se rule. That's exactly what I'm asking for. Would we be the first ones to do that? You would be. And what's the best support for doing that, for a per se rule? Because this case, in this situation, is different. And if you don't do a per se rule, the problem becomes you basically take all the teeth out of young blood and Fisher and those kinds of cases. What is the point of requiring bad faith when there is potentially useful evidence if the remedy is not dismissal? You have those three standards there. You have the fact that there was bad faith, that there was no comparable evidence, and that it was destroyed, and materiality. Potentially useful morphs in with the bad faith destruction. Under the case law, the United States Supreme Court has said, you can tell if there was potentially useful information based on the actions of a case agent. And so we have that. But we have that finding also. The fact that something was destroyed in bad faith, it gives the inference that it was done to prejudice the defense. Otherwise, why destroy it? I see that I am red and out of time. Well, thank you for your argument. Thank you. Mr. Mulrine? Thank you, Your Honor. Good morning, Your Honors. If it may please the Court, Sean Mulrine, appearing on behalf of the United States. The central issue on appeal in this case, the wiping of the laptop by an FBI agent, is an issue that was addressed exhaustively and comprehensively by the district court. After a three-day evidentiary hearing, hearing nearly a dozen or so witnesses, receiving and reviewing numerous exhibits, the court found that the laptop wipe here did not destroy any evidence material to the charges or the defenses in this case, and that was not already in the possession of the defendants. How can we find that out? The shifting of the burden is to the defendant, correct? Correct, Your Honor. And why should that burden be shifted in this situation when who knows what's on that? The only person, presumably, who knows is the agent himself, and yet in this situation, it's in the burden of the defendant to show some kind of prejudice. How is that a proper shift of the burden? Your Honor, of course, when we talk about, and I think this also speaks to Ms. Kohler's point about the case law and the proper remedy here, which she argues under Arizona v. Youngblood and its progeny is dismissal, but I think the case law is clear. When we talk about the violations of a criminal defendant's constitutional rights, the defense carries the burden, and they have to show prejudice, among other things. In this case, where we see bad faith, where there is a finding of bad faith, the burden stays with the defense, but that's because, as we see in Arizona v. Youngblood, it's the potentially useful evidence standard that comes into play, which is different than the apparent material exculpatory evidence standard that we see in Trumbetta. So to Your Honor's point, there's some leeway that's provided there in establishing the showing, but there still must be some prejudice. It just seems it's a different situation than, say, the DNA has been destroyed, and so the defendant doesn't have an opportunity to test it. Well, it's been tested three times. You need to show that your ability to retest it would give a different result, for example. But here, it's just... I don't think this is a pun. It's a black slate. We just don't know what's there, and I'm struggling with that a little bit, on placing that burden on the defendant in this kind of situation. Your Honor, I think the point that you raise, actually, is very central to this appeal, insofar as, really, whoever bears the burden here, it's important to remember the context of this laptop. This laptop was not... There was no relevance attached to this laptop. There were no allegations or accusations concerning what evidence may be on the laptop until there was this discovery dispute involving the additional recordings made by Mike O'Neill. And so unlike, as Your Honor pointed out, the cases where we may see, and fortunately, they are very few, but the cases where we may see a finding of bad faith, destruction of evidence, those are cases in which we're often seeing potentially useful evidence that's like a videotape that may be depicting the criminal activity itself. It's narcotics offenses in which the drugs are destroyed. It's sexual assaults where the bodily fluids may have been disposed of. Here, the laptop itself, there is no evidence before the hearing or since the hearing, or at the hearing, that this laptop contained anything but these recordings. And it's for that reason it was the government, not the court, not the defense, it was the government who asked the agent to turn it over to an FBI forensic analyst to analyze because we simply wanted to get to the bottom of the issue, the issue being when did we have the recordings, how were they obtained through Dropbox. That's the relevance of the laptop. All for purposes of this question to you as well, put aside the alternative of the dismissal. Was there really a remedy? I'm struggling to see how the government really... I don't know that your case was harmed, was it? So you didn't call Cesare, which you didn't want to, I think. I'm guessing. I don't know. And then the recordings don't come in, but I'm not sure that those weren't anything that your office was seeking in the first instance. So it seems it was a remedy, but with no real consequence to the government. Is that a fair assessment? Your Honor, I would say no. And the reason being is, again, and this takes us back to very well, clearly established due process jurisprudence. When there is a violation of a constitutional right, the remedy, the sanction, has to be proportional to the harm. We, of course, see that in a number of cases, including United States v. Blue. Arguably, Your Honors, if Judge Brooks decided within his judgment and discretion not to have any sanction in this case, arguably, Your Honors, that itself would not have been error. There was no prejudice in this case. The court made a very clear and definitive finding to that point. And I'd like to circle back to that a little bit later, but to finish my point here, Your Honor. So there was no prejudice. There was no harm. If the court didn't sanction or issue any remedy, we would submit to you the court would not have erred. That being said, the court recognized that there was bad faith misconduct, and the court decided it was going to issue a sanction. And that sanction was proportional. The misconduct that occurred, Agent Cesario lied. He destroyed, he wiped the laptop. The laptop, the whole importance, if you will, of the laptop, as I noted just moments ago, were the Neal recordings. The court, therefore, decided Agent Cesario could not testify in the government's case-in-chief and those recordings. Whatever their value to the government, those are gone. Those cannot be presented. Now, that did not hamstring the defense. The defense was still entitled to be able to introduce those recordings if they were otherwise admissible and if they deemed them exculpatory or otherwise important. The court didn't preclude them. It only precluded the government. Can I follow up on that point for a moment? And I quite frankly don't understand how this all developed. The defense says that you put up so many hurdles that they would not have been otherwise admissible. And in part because you wouldn't let Cesario testify. You got a motion in limine from the court. Did you say you would object at every stage of the way to introducing any exculpatory tapes? Your Honor, I guess I don't entirely know what the defense means when they say that we were throwing up the hurdles. I presume, and without perhaps being familiar with the entire record that may relate to that specific point, I presume the government would reserve its evidentiary objections were there... Well, why would the tapes not have been admissible if they were exculpatory? Well, Your Honor, I believe the defense is arguing they're exculpatory because there may be some recordings in which Mr. Woods denied that he did something. But, of course, defendants denying that they committed crimes is routinely not something that is admitted at trial. But if Mike O'Neill had said something on the tapes that was inconsistent with his testimony at trial, that certainly would have been admissible and exculpatory. So why would you object to that? Well, Your Honor, to that point, and I know Mr. Banker raised this earlier about Mr. O'Neill, obviously the defense not being able to present any evidence regarding the laptop wipe and all, that wasn't part of anything to do with the remedy or the sanction regarding the underlying laptop issue. That was a motion eliminated by the government. That was a ruling that the court, within its discretion, made a 403 analysis. But as part of that, and I'm reading here from the district court's opinion, I believe this was issued on April 3, 2018, in granting in part the government's motion to eliminate it, the court wrote, the defendants are free to cross-examine Mr. O'Neill about the recordings he made. They are free to ask him about his interactions with Agent Cesario. They are free to ask him who he gave his recordings to and when he did so. They are free to ask him about his motives for testifying. And the court went on, as I think Mr. Banker acknowledged, and perhaps Mr. O'Neill's responses to those questions will lay some presently unforeseeable foundation to connect his testimony with Agent Cesario's decision to wipe the laptop. And the court, therefore, left open the possibility, if there was adequate foundation, that they could revisit that issue, which they did not. And maybe I should be asking Mr. Banker this question, but was there any offer or proof made, these are the recordings that we feel are exculpatory and would impeach Mike O'Neill, and we would like to have them introduced? No, Your Honor, I'm aware of no such proffer by defense. So we can't go into the record and see, okay, this is the tape where Mike O'Neill said something that was inconsistent with his testimony. Correct, Your Honor, and I'm not familiar with the record showing any inconsistency, per se, from Mike O'Neill's testimony. But again, to the extent there was, defense certainly could have asked the court to be able to present that as impeachment. And I think the court's order allows for that, or at least it allows for the possibility of that. But that was not an issue that was litigated, Your Honors. And as I said moments ago, the court found, based on its factual findings, that there was no prejudice in this case, and therefore denied dismissal of the indictment, but of course did impose sanction nonetheless. And the no prejudice finding is all predicated upon the fact that Mike O'Neill had turned the recordings over to his lawyer's secretary, who purportedly then had all the originals still on her computer, right? Yes, Your Honor, I think that's in part. I thought that was the whole finding, but yes. I mean, that's a big part of the finding, is that they had independent access to the recordings. That's correct, comparable evidence, as it's referred to in the jurisprudence, that's right. The defense, again, and I know I'm repeating myself here, but the whole point of the laptop, the whole initial point of this evidentiary hearing was a discovery dispute over the recordings. The defense got all of those recordings. And to the extent, as Ms. Culler argued moments ago, that there were forensics or there was maybe an open question about this or that, those are all factual questions. Those were all issues that were raised during a three-day evidentiary hearing with forensic analysts and other firsthand witnesses to testify. The court heard all of that and was certainly able and willing to hear all of that, and the court made its factual determinations, which, of course, those determinations are entitled to deference by this court. So the defense received the recordings. Let me just follow up with one other question, if I could. So as far as the prejudice is concerned,  what do you make of the fact that he did say there may be potential exculpatory information? Your Honor, I did not understand Judge Brooks' opinion at all to suggest there was any possibility of exculpatory information. What I understood his opinion to say was very definitively that he found that the laptop wipe destroyed no material information, material to the case that wasn't already in the defendant's possession, i.e. the recordings. And I think in the court reaching that conclusion, I think several things were at play. One, again, was the notion of what was this laptop, what was its relevance to the case. I know I've already covered that. Judge Brooks also found, just as he did find Agent Cesario not credible on virtually everything, he notes in his opinion, he makes the observation, and this is a factual finding, which, again, we would argue is entitled to deference. He says that while Agent Cesario was reasonable enough to not destroy the laptop simply for medical records, and that, of course, is where he's found not credible, the court does note that he was also reasonable enough not to destroy the laptop simply to destroy evidence damaging to the case. Judge Brooks, following this hearing, was convinced, as articulated in this opinion, that there was no material or exculpatory evidence on that laptop and believed that Cesario did not wipe it for that purpose. And in furtherance of that conclusion, the court noted that, drawing reasonable inferences, that had Agent Cesario wiped the laptop for purposes of hiding some evidence, which, again, no one has been able to truly point or articulate what that would be, the court found that it would have expected Agent Cesario to have done it in a much more furtive manner to carry out that objective, whereas opposed to, per se, if the agent was trying to wipe something that was of a more personally inculpatory nature, then perhaps acting as he did here was more reasonable. But the district court did find a due process violation. That's correct, Your Honor. And that's because of the bad faith misconduct, the wiping of the laptop. So then it just became, what's the remedy for, essentially? If a remedy was in fact warranted. That's correct, Your Honor. And I think, if I may, going back to Ms. Kohler's point about the remedy being sought here, I mean, we're even hearing on appeal. The remedy sought here, at least by Mr. Sheldon, isn't anything but dismissal. And again, the case law is very clear on constitutional violations, which this is, that dismissal is a disfavored remedy and that certainly prejudice is required to even reach for that remedy. As we argued, as far as there was any harm, the court's remedy here was proportional to that. But we would submit to you, it cannot be the rule that even when there's a bad faith destruction of evidence, it cannot be the rule that there is a bright line, a categorical per se rule that that evidence is wiped out, that the case is wiped out, because that is at the expense of the public's interest in seeing criminal activity prosecuted. You filed the motion in limine, correct, to keep out any evidence to the jury of what happened here? Yes, Your Honor. And the district court granted that. Why would that? I think the argument in response is it's not so complicated. It wouldn't be a mini-trial. Just explain what Cesario did. We've discussed it here in a 30-minute argument. Why is that a mini-trial? Why isn't that just explaining what happened during the course of this investigation that a jury should be able to hear? Yes, Your Honor. And, of course, the standard of review on a 403 analysis such as that is abuse of discretion. And, Your Honor, we would submit to you that the judge was well within his discretion on that ruling. And being that he sat through and presided over the three-day evidentiary hearing in which witness after witness, record after record, and often very complicated records such as forensic analysis, metadata, dropbox activity logs were ushered in front of the court. The record certainly makes clear just how complicated and nuanced this was. But it seems to me that really what I think the defendants want in front of the jury is just the pretty much bare-bones facts, not necessarily how it happened. And the district court has made a ruling on whether the defendants met their burden on if it was anything material in the evidence. It doesn't seem very complicated just to say, here's an agent. He was asked to bring his laptop that had evidence on it. And he wiped it once and then twice. The district court certainly was in the best position to weigh whether or not this would devolve into a mini trial and confuse the issues. And the government certainly agrees with that ruling. And again, we would argue within the court's discretion and was well-founded. But to Your Honor's point, quite frankly, it's not relevant to the trial. It is not relevant what happened involving a discovery issue, involving a laptop that has no connection to the defendants, has no connection to their defense. The recordings were the issue. And the recordings were provided. And those were not excluded, at least for the defendants' use. So there was no relevance. But to the extent there was any probative value at all regarding that, it was substantially outweighed by the prejudice and the other four or three factors as the court clearly held. And the reason being is, I think as the court aptly noted very succinctly, it would invite a jury to find the defendants innocent simply as a punishment per se or as a rejoinder to the government's and the agents' misconduct. And that is not a proper basis on which a jury should make a decision when we're talking about the guilt or innocence of criminal defendants. And that also is a distinction. I believe it's Mr. Woods in his briefing points to the cases where defendants' destruction of evidence comes in this consciousness of guilt. Whereas as we argued in our briefing, that's because that is the issue. That is the focus of a criminal trial. The government's misconduct is not what's being put on trial. To the extent that government misconduct is relevant, and it certainly is relevant to the overall proceedings, to the integrity of the proceedings, that is addressed as it was here in an evidentiary hearing outside the presence of the jury. So, Your Honor, as far as that decision by the district court, the court was absolutely correct not to let the trial devolve. And even if there was to be no dissent into madness, as there may have been with some of the evidentiary hearing, the district court was still correct that there was potentially outweighed by the potential prejudice to the case and the interest of justice here. If I may touch on briefly just a few points that were raised by defense during their argument, the government would disagree with the assertions and some of the characterizations by Mr. Benka, for example, with Agent Cesario being the lead case agent, almost to the exclusion of IRS Agent Munns. IRS Agent Munns was very much involved throughout the case in terms of interviewing and, as I understand, record collection and the rest. So it wasn't as simple as Agent Cesario just ran this whole investigation and no one else was involved. Moreover, there's talk about the evidence at trial and Mike O'Neill's role in that. Well, it is true. Mike O'Neill testified, and he did present direct evidence regarding the bribery-fraud scheme at play. I would note here, again, he was susceptible to cross-examination, and as I read from the court's 403 opinion or motion in limine ruling, defense could have pursued that. And we heard from Ms. Kohler, they chose not to go down the route of the records. Do you agree that the government needed Mike O'Neill in order to give the jury an understanding of the documents or what would your case have looked like on the documents alone? Yes, Your Honor, thank you. And that's exactly where I wanted to go, which is I believe the district court, and I don't have it at my fingertips, but I believe in one of its rulings, probably one of the post-trial motion rulings, the district court, I think, noted that the evidence in this case was overwhelming, and the government stands by that assertion. Was that as to both defendants or just the assertion was made that as to defendant Shelton, it was critical to the issue of bribery and kickbacks? Your Honor, the evidence, independent of Mr. O'Neill, the case is largely circumstantial, but as we know, circumstantial evidence carries the same weight as direct. That evidence involved records showing cash payments that Mr. Woods was procuring from the state, GIF funds that was going to Ecclesia College, payments then in short order going to Paradigm Strategic Consulting, the business run by Mr. Shelton, and then big, large cash withdrawals being pulled out. All of this contemporaneously, essentially, or within close time period. We then see on a number of occasions where there are deposits by Mr. Woods. There are instances in which Mr. Woods then is making substantial payments to a jeweler for whom he had outstanding debt or loan payments to be made. All of this ties together very closely temporally, and we would submit to you, Your Honors, given the official action with the legislation, given the substantial money that was going to Mr. Shelton, and then the substantial, suspicious withdrawals that Mr. Shelton was pulling, that that is a strong circumstantial case of bribery and fraud, not unlike the kinds of cases that the government sees, where perhaps we don't have a cooperator or direct evidence. I would also note to that point that, again, Mr. Shelton and his company were ostensibly getting these payments for consulting services. We would submit to you the evidence that trial showed that Mr. Shelton and his company were neither qualified to be earning that, the types, the amounts of money he was receiving, and, in fact, wasn't doing very much to earn that money. Now that, again, of course, are factual issues. Those were presented to the jury, and, of course, the jury convicted them. So the government would assert that the evidence at trial was overwhelming to both defendants and certainly stands on its own independent of Mr. Neal. But as far as Mr. Neal's concern, going back to the earlier points, again, there is no evidence. The only reason we're talking about Mr. Neal is because we're talking about the laptop and the recordings. The court found that it was able to get to the bottom of the issue here, which was when did the government learn of the recordings, when did it have possession of them, and were there any additional secret recordings that Mr. Neal made and sort of furtively handed off to Agent Cesario.  until essentially what the government had represented, including Agent Cesario, that he had not obtained them previously. And the court found that there were no secret additional recordings. The court found it incredible, unbelievable, that Mr. Neal would have made these recordings and surreptitiously passed them to Agent Cesario without going through his attorney, Shane Wilkinson. To reach these conclusions, the court did not have to rely simply on Agent Cesario. In fact, there was no reason to rely on him. The court could rely on the testimony of Mr. Neal himself, who said that he always provided the recordings to Mr. Wilkinson's office, namely Carrie Layton, the paralegal. The court relied on the testimony of Ms. Layton. The court relied on the testimony of Mr. Wilkinson. And then, of course, there's the forensic information, the dropbox activity logs and the metadata of the recordings. All of that, Your Honor, shows that the recordings went to Mr. Wilkinson's office, found their way to the defendants ultimately. But there is no evidence suggesting, and I think this goes back to Judge Malloy, your point earlier, is there anything other than just this association between Neal and this agent that would suggest there is more incriminating or exculpatory evidence out there that somehow wasn't obtained? No, there's none. There is nothing more than sort of speculation. And unfortunately, we're in a position, because we have a laptop that was wiped, it invites us to project onto it everything and anything that could be on that laptop. But there is no basis in the record or otherwise that suggests that there was anything on that laptop relevant to this case other than the recordings that were turned over. And insofar as, and to that effect, the district court made specific definitive factual findings on this issue, well supported by the record and to which it is entitled to deference on those issues. Your Honors, I'll just touch very briefly, unless Your Honors have any further questions on this or any of the other issues. I will just note for the motion to disqualify the recusal issue, Mr. Benka invited the court to look at the record, to look at the transcripts. In that, we agree. The government would recommend the court look at the record, look at the transcripts. The government respectfully submits that the court was patient under what at times were challenging circumstances. And we would submit that there is nothing at all that provides any appropriate basis for recusal. Certainly not adverse rulings as the case law is clear. Certainly not the court's interjecting with a witness, which I think you'll see even on the briefing. The court did not interject. The government timely objected. The court issued a ruling. Is there a question on the transcript on that? Has that been resolved? Your Honor, I understand there was a question from defense on that. As far as the government is concerned, that was resolved. But regardless, even if the court had interjected, as Your Honors would see in the transcript, it was on a minute issue, and the court was well within its right to make sure that a witness and evidence was being properly handled. But again, the government did object to that, as I think the transcript reflects. And then as far as the motion for continuance, simply put among other reasons, Mr. Oren Paris did not testify. Was he ever put out as a government witness, however? Your Honor, I believe he was noticed as a potential witness. I believe that is true. But he did not testify. And by the time that that motion for continuance was made, that was over a year since the case had been indicted. That was, I believe, the second continuance requested by defense. We already had an additional continuance from December to April because of the whole evidentiary issue. And as we know, in our briefing, defense had represented to the court, other than this turn of events when Mr. Paris said that he was ready to go. When the government identified Mr. Paris as a witness, did they also identify a summary of his potential testimony, such that it might have shifted the defense strategy? Your Honors, I apologize. I don't recall whether a summary was provided. I believe we would have provided the 302s related to any interviews or proffers with Mr. Paris. But I apologize. I don't have a specific recollection on that at the moment. But I believe if there were interview reports, those would have been provided. But again, to that point, Your Honor, obviously it is firmly within the purview and the discretion of a district court about continuances. Perhaps few, if anything, is more fully centered within their discretion. And here, given the length of time from time of indictment, given the number of continuances, and given, again, that there was nothing at trial, the defense was not prohibited from presenting anything at trial, there was no new evidence per se, there was no basis, Your Honors, for a continuance. The court certainly, again, was within its discretion to decide as much. I'll ask the question we've all been speculating about. What happened to Agent Cesario? Your Honor, to the extent of my knowledge and what I may be able to share, Agent Cesario, I believe, is currently suspended without pay pending final resolution. If there's no further questions. Thank you, Your Honors. Thank you. Council have rebuttal? I have 40 seconds. We'll give you a full minute. Thank you, Your Honor. I appreciate it. I want to go back real quick. What happened, the reason why the bad faith finding by Judge Brooks and the potentially useful information is important by Judge Brooks because it takes it out of trombata. It takes it out of blue. Under Youngblood, it says bad faith and the potentially useful information. That, in other cases, has resulted in an outright dismissal, period. It's rare. It happened in two cases, one in the Ninth Circuit, one in the Eleventh Circuit. It's outlined there. It is rare. But it's not a per se rule. What we're asking the court to do is to follow the rule. It was mentioned. I know the court has used it in, I think, the case was Norton, was the case that they adopted Youngblood. But if you follow Youngblood, bad faith, district court already found that. The government has no objection. They didn't raise that on a de novo appeal. And you also have potentially useful. Again, that's the other element of Youngblood. The government did not try to attempt to address that on de novo appeal. So those are facts. Those facts alone lead to dismissal under Youngblood. So that's what I'm asking this court to do. Thank you, Mr. Franklin. And I am out of time. Thank you. I appreciate the court. Did you have anything else you wanted to respond? Speaking to Ms. Kohler. It's on. All right. Well, thank counsel on both sides.